IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


TED PAPAS, an Oregon                    3:10-CV-00550-BR
resident; ARCADIA
ENTERPRISES, INC., an Oregon
corporation; DOWNTOWN DELI              OPINION AND ORDER
AND GREEK CUSINA, an assumed
business name; DOWNTOWN
DELICATESSEN, INC., an Oregon
corporation,

          Plaintiffs,

v.

CHARLES RANDALL ("RANDY")
LEONARD, an Oregon resident,
and the CITY OF PORTLAND, an
Oregon municipal corporation,

          Defendants.


JOSEPH JAMES HADDAD
JJH Law
351 N.W. 12th Avenue
Portland, OR 97209
(503) 552-1467
(503) 802-2053

          Attorneys for Plaintiffs


1 - OPINION AND ORDER

**JIM VAN DYKE**
Portland City Attorney
**TRACY POOL REEVE**
**ELLEN C. OSOINACH**
Deputy Portland City Attorneys
1221 S.W. Fourth Avenue, Room 430
Portland, OR  97204
(503) 823-4047

      Attorneys for Defendants


**BROWN, Judge.**

This matter comes before the Court on Defendants' Motion
(#38) for Summary Judgment.  For the reasons that follow, the
Court **GRANTS** Defendants' Motion.


<u>BACKGROUND</u>

Except as noted, the following facts are viewed in the light
most favorable to Plaintiffs:

Plaintiff Downtown Delicatessen, Inc., was an Oregon
corporation that operated a restaurant/nightclub business at 404-
418 S.W. Washington Street under the assumed business name
Downtown Deli and Greek Cusina.[1]  Plaintiff Arcadia Enterprises,
Inc., was an Oregon corporation[2] that owned the building located
at 404-418 S.W. Washington Street (the Premises) from 1995

_____

[1] Downtown Delicatessen, Inc., was administratively
dissolved on August 26, 2011.

[2] The parties' Statement of Agreed Facts provides Arcadia
Enterprises "was" an Oregon corporation, but the parties do not
specify when, if ever, it ceased to be an Oregon corporation.

2 - OPINION AND ORDER

through January 2010.  Plaintiff Ted Papas was a 50% shareholder in and President of both Downtown Delicatessen and Arcadia Enterprises.

From 1995 through 2008 Plaintiffs had construction performed on the Premises.  Plaintiffs did some of the work without City permits because (1) no permits were sought; (2) final permit approval was not obtained; and/or (3) final inspections were not timely obtained and, in those instances, applied-for permits became void.  Unpermitted work included, among other things, installing a kitchen in the basement of the Premises, remodeling the first floor, adding apartments to the top floor, and adding a dumbwaiter that went from the basement kitchen to the top floor.

In 2002 Papas publicly voiced objections to the City of Portland's licensing of food carts, and he attempted to organize restaurant owners to lobby against what he believed to be unfair competition by the food carts.

On September 1, 2004, Capital Pacific Bank loaned Plaintiffs $1.5 million secured by the building.

Between June 2003 and December 2006, the Oregon Liquor Control Commission (OLCC) warned Downtown Delicatessen, as holder of the Full On-Sale Premises Sales License, 14 times about reports of disorder, minors in prohibited areas, and/or overservice on the Premises.  OLCC inspectors issued instructions or warnings to Downtown Delicatessen when the OLCC inspectors

3 - OPINION AND ORDER

received police reports of disorder on or around the Premises.

In August 2006 Papas met with OLCC Regional Manager Janice Kindrick and officers from the Portland Police Bureau (PPB) to discuss the incidents.  Papas submitted a list of measures that Plaintiffs had implemented to address the problems.

From January 2007 through February 9, 2008, the OLCC, nevertheless, issued warnings to Plaintiffs regarding 34 additional incidents that occurred on or around the Premises.

On March 21, 2008, the OLCC issued a Notice of Proposed License Cancellation to Downtown Delicatessen advising there had been a history of serious and persistent problems at the Premises in violation of Oregon Revised Statute § 471.315(1)(c).

By May 2008 Plaintiffs were using the basement of the Premises for refrigerated food storage, as a food-preparation kitchen area, as a place for employees to change and to store their possessions, and as an office.  Plaintiffs were using the first (ground) floor as a restaurant, deli, and kitchen. Plaintiffs were using the second floor on weekends for a dinner show involving Greek dancing, belly dancers, and traditional Greek music (the Greek Show).  Plaintiffs were using the third floor for banquets and parties and, later in the evening, as a nightclub and dance floor open to the public.  After the Greek Show ended at 11:30p.m., Plaintiffs occasionally used the second floor as a nightclub and dance floor.  Plaintiffs rented space on

the floors above the third floor to tenants as office space and used those floors for storage and office space for the restaurant.  The top floor contained unpermitted apartments and was used as living space.

Also as of May 2008 the City of Portland had an interbureau work group, the Code Compliance Intervention Team (CCIT), with participation by Portland Fire & Rescue (PF&R), the City of Portland Bureau of Development Services (BDS), and the PPB to address properties that presented heightened public health and safety concerns.[3]  According to Defendants, the CCIT chose the properties to address by examining a number of factors including fire- and building-code violations and a history of high levels of police and/or fire services.  Defendants assert the purpose of the CCIT was to coordinate the approach of various City bureaus to properties that posed an elevated risk to public health and safety and to comprehensively address those properties that were noncompliant with the Portland City Code.

CCIT members selected properties to bring to the attention of the work group and, in particular, to the attention of Defendant City Commissioner Randy Leonard who coordinated the work of the CCIT.  Commissioner Leonard made the final decisions as to which properties to approve for CCIT attention.

---

[3] According to Defendants, the CCIT no longer existed as a dedicated work group by July 2010.

Portland Police Officer Jeff Myers was a member of the CCIT. From 2003 to 2009 he worked in the neighborhood where the Premises was located and gained substantial knowledge of the criminal and nuisance activity in that area as a Portland Police Officer.

Defendants allege Officer Myers, in concert with his community policing efforts, attended a meeting in April 2008 at which OLCC representatives were present.  According to the deposition testimony of Officer Myers, OLCC Representative Jackie Paul advised Officer Myers at that meeting that the OLCC had a confidential informant who "had some information about some . . . serious fire/life safety issues involving the Greek Cusina." Decl. of Joseph Haddad, Ex. 2 at 8.  On May 6, 2008, Officer Myers met with Paul, PF&R Fire Inspector (FI) Michael Alderman, BDS Inspector (BDSI) Joe Botkin, and BDSI Hank McDonald[4] to discuss the information provided by the OLCC confidential informant.  *Id*.  As a result of that meeting, FI Alderman, BDSI Botkin, BDSI McDonald, and Officer Myers decided to look into the "history" that BDS, PF&R, and PPB had relating to the Premises. *Id*. at 10.  FI Alderman, BDSI Botkin, BDSI McDonald, and Officer Myers determined there were "some [building] code history violations . . ., fire code violations, . . . [and] a high incidence of calls for [police] service."  *Id*.  Accordingly, they

---

[4] Each of these individuals were members of the CCIT.

decided to "do an inspection of [the] [P]remises to see if [the] confidential informant's information was credible." *Id.*

FI Alderman advised Papas before May 14, 2008, that there would be an inspection.  On May 14, 2008, representatives from BDS, PF&R, and PPB went to the Premises and requested consent to conduct an inspection.  Papas advised he would not allow an inspection without a warrant.

BDS, PF&R, and PPB representatives obtained a warrant and conducted an inspection later on May 14, 2008, during which BDS and PF&R inspectors found numerous building-code and fire- and "life-safety" code violations.  Also that same day, Commissioner Leonard came to the Premises and various areas of concern were pointed out to him.  Commissioner Leonard testifies in his Declaration that he observed fire- and life-safety violations that he believed to be the most dangerous he had seen in his 25 years as a Portland Firefighter and Fire Inspector as well as serious building-code violations.  He was also advised the Premises had a history of high numbers of police calls for service.  Decl. of Randy Leonard at ¶ 18.  Accordingly, Commissioner Leonard concluded the Premises was an appropriate property for the CCIT to address.  *Id.*

On May 15, 2008, PF&R personnel accompanied by PPB personnel returned to follow up with Plaintiffs.  On that day BDS personnel accompanied by PPB personnel also returned to follow up with

Plaintiffs.  PF&R issued a Fire Inspection Report and Order to Papas in which PF&R noted numerous fire-code violations and ordered Plaintiffs immediately to discontinue use of the Premises above the second floor and to provide PF&R with a "structural engineer's report on the stability of the basement ceiling/1st floor membrane."  Decl. of Michael Alderman, Ex. 2 at 1.  PF&R, however, did not require a fire watch as long as Plaintiffs allowed PF&R to access the Premises as necessary and complied with the other requirements of the Order.

On May 19, 2008, Officer Myers and FI Alderman returned to the Premises and found tenants and employees using areas of the building above the second floor in violation of the May 15, 2008, Order.  FI Alderman issued to Plaintiffs a Fire Code Citation noting the violation.

On May 23, 2008, BDSI Botkin issued to Papas a Notification of Dangerous Structure and Order to Demolish or Repair in which Botkin advised Papas that the BDS had found the Premises to be dangerous and "ordered and required" Plaintiffs (1) to "immediately vacate the 4th, 5th, and 6th floors of the structure"; (2) to obtain appropriate permits for the repair of the structure no later than July 18, 2008; and (3) to have the Premises inspected and approved by BDS no later than January 1, 2009. Decl. of Joseph Botkin, Ex. 1 at 2.

On May 27, 2008, FI Alderman wrote a memorandum to PF&R

8 - OPINION AND ORDER

Chief Tim Kelly in which he advised it was FI Alderman's
"professional opinion that [the Premises] should be considered an
imminent hazard to life, safety, and the City of Portland [and]
should be placed on the 'Unsafe Building List.'"  Alderman Decl.,
Ex. 3 at 1.  Also on May 27, 2008, PF&R imposed a fire watch on
the Premises.

On May 29, 2008, Plaintiffs hired Reliant Security to
perform the fire watch.

On June 2 and 3, 2008, CCIT members and a consultant hired
by the City of Portland met with Papas and his advisor, David
Emami, to discuss issues with the Premises.

On June 10, 2008, FI Alderman, Officer Myers, Papas, and
Stephen Winstead, the consultant who Plaintiffs hired to attempt
to bring the Premises into compliance with the various City
codes, discovered dirty dishes, a blanket, and personal items in
one of the top-floor apartments of the Premises.  Papas assumed
his son had slept in the apartment the previous night in
contravention of the May 15, 2008, PF&R Order and the May 23,
2008, BDS Order to cease all use of the Premises above the second
floor.  Also on June 10, 2008, FI Alderman interacted with the
Reliant Security individual on duty for the fire watch and found
the fire watch to be inadequate.  Specifically, the individual
did not have a telephone on his person, did not have an adequate
flashlight, and did not know what to do in the event of an

emergency.  As a result, PF&R required Plaintiffs to use a City-certified firm to conduct the fire watch.

At some point before June 12, 2008, Plaintiffs hired City-approved Securitas to conduct the fire watch.

On June 18, 2008, Officer Myers and FI Alderman found approximately seven individuals in the basement of the Premises doing food preparation in violation of the PF&R and BDS orders.

On June 19, 2008, Fire Marshal John Nohr investigated the Premises and initially ordered the basement to be sealed off. Papas, however, explained access to the basement was essential to the operation of the business because it contained the refrigerated storage area.  Fire Marshal Nohr, therefore, ordered the basement could be used by no more than three employees solely for storage and retrieval of food.

On June 23, 2008, BDS issued to Plaintiffs a Compliance Request Construction Code Violation - Permit Required in which BDSI Botkin set out the unpermitted work observed during the inspections of the Premises and directed Plaintiffs to obtain permits for that work.

On July 15, 2008, Papas appealed the terms of the fire watch to the Fire Board and sought to have the fire watch lifted.

On July 27, 2008, Winstead submitted to City of Portland Senior Plans Examiner Ben Howell a Fire and Life Safety Analysis of the Premises on behalf of Plaintiffs in which Winstead

proposed a "plan of action that will generate permits, obtain appeals and provide a phased in development that would . . . permit use of [the] structure as improvements were completed." Decl. of Tracy Poole Reeve, Ex. 7 at 1.

On August 6, 2008, Officer Myers and FI Alderman found five employees working in the basement of the Premises in violation of the June 19, 2008, Order by Fire Marshal Nohr.

On August 20, 2008, Winstead submitted to Chief Kelly a Security Plan for the Premises "to provide a reasonable measure of safety for both the patrons and employees of [the Premises]. It will permit limited use of the basement, floors above the second floor and continued full use of the first and second floors." Reeve Decl., Ex. 8 at 1. If Plaintiffs did not comply with the Security Plan,

> 1. [The Premises] will be vacated and a fire watch shall be established with the City of Portland determining what 3rd party security provider to be used. The cost of the 3rd party security provider is the responsibility of the building owner.
>
> 2. [The Premises] will remain vacated except for construction access for the work being done as part of the approved permit and phased development.
>
> 3. [The Premises] can be occupied only upon approval by the City of Portland.
>
> 4. Determination of non-compliance to the measures agreed upon herein will be the responsibility of the Fire Marshal's Office, Portland Fire and Rescue.

Reeve Decl., Ex. 8 at 3-4.  Papas signed the Plan on September 9,
2008, and Fire Marshal Nohr signed the Plan on September 11,
2008.  Under the Plan, Plaintiffs were permitted to provide a
fire watch using their own personnel as long as they remained
compliant with the Plan provisions.  On September 12, 2008,
FI Alderman trained Plaintiffs' personnel as to the proper way to
conduct a fire watch.

On October 14, 2008, the Fire Board convened, admitted
evidence, took testimony from Plaintiffs and PF&R related to the
fire watch in place at the Premises, and upheld the fire watch.
The Fire Board held in abeyance for six months the fines against
Plaintiffs for failure to comply with the fire code in order to
provide Plaintiffs with the opportunity to correct the
violations.

On October 23, 2008, FI Alderman attempted to call the fire-
watch telephone number at the Premises and became concerned when
no one answered the telephone.  FI Alderman later realized he was
calling the wrong number, but he believed he was calling the
correct number at the time.  FI Alderman was "nearly home" at the
time he called, but he was aware Officer Myers was on duty and
working near the Premises.  Accordingly, FI Alderman asked
Officer Myers to check the status of the fire watch.  When
Officer Myers went to the Premises, it did not appear to him that
Plaintiffs' employees were complying with the terms of the fire

12 - OPINION AND ORDER

watch.  According to Defendants, Officer Myers also found employees in the basement engaging in activities other than storage and retrieval of stored items in violation of the September 2008 Security Agreement and the May 2008 PF&R and BDS Orders.

Officer Myers advised FI Alderman of his findings.  Shortly thereafter FI Alderman went to the Premises and determined the fire watch had not been adequately conducted.  Although Defendants, under the terms of the Security Agreement, could have closed the Premises down completely because of Plaintiffs' failure to conduct the fire watch properly, Defendants instead reinstituted the third-party fire-watch requirement.  The City paid the cost of the third-party fire watch, but notified Plaintiffs that they would ultimately have to repay the City for the costs.  At some point the City filed liens against the Premises for the cost of the third-party fire watch.

On February 2, 3, 9, 13, and 18, 2009, the OLCC held hearings before an Administrative Law Judge (ALJ) as to the Notice of Proposed License Cancellation issued to Downtown Delicatessen during which the OLCC heard testimony from 41 witnesses.

On April 28, 2009, Plaintiffs and the City entered into a Partial Settlement Agreement related to proceedings before a City Code Hearings Officer in which Plaintiffs "admit[ted] the

13 - OPINION AND ORDER

following disputed allegations contained in the[ir] complaint
[before the Code Hearings Officer]":

> On May 14, 2008 and continuing presently [Papas]
> violated Portland City Code Section 29.40 because
> the property contains a dangerous structure.

> On May 14, 2008 and continuing presently, [Papas]
> violated Portland City Code Sections 24, 25, 26,
> and 27[5] by performing construction work without
> proper permits or inspections.

Reeve Decl., Ex. 9 at 1.  Plaintiffs also agreed to correct the
Portland City Code violations; to bring the Premises into
compliance with the Portland City Code; to pay a penalty up to
$1,000 for "aggravating circumstances" for "staff cost recovery";
and to pay a civil penalty of $10,000 for "aggravating
circumstances."  *Id*.

On August 18, 2009, the Code Hearings Officer issued an
order in which he upheld the BDS and PF&R findings of building-
and fire-code violations.  The Code Hearings Officer ordered
Plaintiffs to comply with the terms of the Partial Settlement and
to vacate the Premises.  Reeve Decl., Ex. 10 at 11.  The Code
Hearings Officer, however, suspended the order to vacate as

> long as a licensed and bonded security company is
> engaged to provide a City of Portland Fire Marshal
> approved fire watch.  So long as the approved fire
> watch is in operation . . . the restaurant
> operations may continue.  If the fire watch does
> not operate in strict compliance with the terms
> [directed], the Subject Property shall be vacated

---

[5] These code provisions relate to building, plumbing,
electrical, and heating and ventilation regulations.

14 - OPINION AND ORDER

> by the City at its earliest opportunity.
> Respondents shall be responsible for all costs
> associated with the provision of fire watch
> services and the fire watch must be in full
> operation within 15 days of the date of this
> Order.  The fire watch contract shall be subject
> to review and approval by the Fire Marshal's
> Office. . . .  The fire watch Imposed by this
> paragraph shall continue until It is determined by
> the Fire Marshal's Office that the Subject
> Property no longer presents a serious fire safety
> risk to occupants, employees, visitors and
> neighboring properties.

*Id*.

At some point in the fall of 2009, Plaintiffs asked Commissioner Leonard to have the City forgo or subrogate its liens against the Premises for the funds expended by the City to pay the third-party fire watch.  According to Plaintiffs, subrogation of the City's liens would improve Plaintiffs' chance to secure additional funding from Capital Pacific Bank to bring the Premises up to code.  Commissioner Leonard, however, declined to forgo or to subrogate the City's liens because, according to Defendants, Commissioner Leonard "did not believe there was any justification for the public to forgo its legal right to recoup its expenditure of public funds."  Leonard Decl. at ¶ 27.

A meeting was held that fall at which representatives of Capital Pacific Bank, Plaintiffs' representatives, and representatives of the City were present and the cost of the repairs needed at the Premises was discussed.  BDSI McDonald stated he thought the cost of bringing the Premises into

15 - OPINION AND ORDER

compliance would be more than Plaintiffs' proposed contractor estimated.

On October 27,2009, the OLCC issued its Final Order related to Plaintiffs' challenge to the OLCC's Notice of Proposed License Cancellation in which the OLCC Director found

> over the course of 15 months (from January 20, 2007 to April 26, 2008) there were at least 27 documented disturbances involving violence or threats of violence (fights, altercations, assaults and/or harassment) involving patrons of the licensed premises inside, or in the immediate vicinity of the premises.

> * * *

> Since the April 26, 2008 incident, however, there have been significantly fewer problems at the licensed premises.

> * * *

> This gap of seven months between serious problems and the overall decrease in the need for police service at the licensed premises since April 2008 . . . is likely attributable to a combination of factors, not all of which were Licensee's volition.  Between late April 2008 and August 2008, Licensee made changes in operation and refocused its security and bar staff to recognize and address intoxicated patrons and inappropriate behavior.  In addition, since mid-May 2008, Licensee has been prohibited from using the third floor banquet hall and dance floor.  The closure of the third floor was involuntary but the resulting reduction in Licensee's patron capacity along with other measures Licensee employed, had enabled Licensee to better control the premises and patrons' behavior in the immediate vicinity of the premises.

Reeve Decl., Ex. 11 at 19, 24-25.  The OLCC found "mitigation is warranted."  *Id*. at 26.  Accordingly, the OLCC concluded "instead

16 - OPINION AND ORDER

of cancellation, an appropriate sanction is a 30-day suspension or a civil penalty of $4,950." *Id*. The OLCC noted, however, Plaintiffs' inability to use the third floor of the Premises "is not permanent," therefore, "should [Plaintiffs] regain use of [the] third floor for the sale or service of alcohol, its ability to control the Premises and its level of risk for future compliance would be significantly compromised." *Id*. Accordingly, the OLCC imposed a number of restrictions on the sale, service, and consumption of alcohol that applied to the entire Premises and advised Plaintiffs' license would be subject to cancellation if Plaintiffs failed to comply with those restrictions. *Id*. at 27-28.

By December 2009 BDS had issued building permits for the work necessary to correct the code violations at the Premises. Plaintiffs, however, never picked up the permits. At some point Capital Pacific Bank initiated foreclosure and receivership proceedings against Plaintiffs. In January 2010 Plaintiffs deeded the Premises to Capital Pacific Bank in lieu of foreclosure and closed the business.

## PROCEDURAL HISTORY

On May 13, 2010, Plaintiffs filed this action against Commissioner Leonard, FI Alderman, Fire Marshal Nohr, Officer Myers, BDSI Botkin, the City of Portland, and Doe Haney in which

17 - OPINION AND ORDER

Plaintiffs asserted claims under 42 U.S.C. § 1983 for
(1) retaliation in violation of their rights under the First
Amendment, (2) "race and ethnic discrimination," and (3) wrongful
search and seizure in violation of their rights under the Fourth
Amendment.  Plaintiffs also asserted state-law claims for
intentional interference with economic relations, "slander on
title," defamation, and trespass.

On January 21, 2011, Plaintiffs filed an Amended Complaint
against Commissioner Leonard and the City of Portland in which
Plaintiffs (1) assert a new claim under § 1983 for violation of
their rights under the Equal-Protection Clause, (2) reassert
their § 1983 claim for retaliation in violation of their rights
under the First Amendment and their state-law claim for tortious
interference with economic relations, and (3) withdraw their
claims for "race and ethnic discrimination" and wrongful search
and seizure in violation of their rights under the Fourth
Amendment.

On November 17, 2011, Defendants filed their Motion for
Summary Judgment against all of Plaintiffs' claims in the Amended
Complaint.  The Motion was fully briefed as of January 19, 2012,
with the 34 filings docketed as Nos. 38 through 72.

After completing a preliminary consideration of all of the
matters in the record, the Court on April 6, 2012, provided a
draft version of its preliminary Opinion and Order to the parties

and offered them an opportunity for oral argument.  In response,
Plaintiffs asked only to file a supplemental written statement
and to introduce an additional document into evidence.
Defendants did not object to Plaintiffs' request as long as
Defendants would have leave to respond to Plaintiffs'
supplemental filing.  Accordingly, the Court granted Plaintiffs
leave to file additional materials and Defendants time to
respond.  The Court took this matter under advisement again on
April 20, 2012.


<u>**STANDARDS**</u>

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." *Washington Mut. Ins. v. United
States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R.
Civ. P. 56(a).  The moving party must show the absence of a
dispute as to a material fact.  *Rivera v. Philip Morris, Inc.*,
395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly
supported motion for summary judgment, the nonmoving party must
go beyond the pleadings and show there is a genuine dispute as to
a material fact for trial.  *Id*.  "This burden is not a light one
. . . .  The non-moving party must do more than show there is
some 'metaphysical doubt' as to the material facts at issue." *In
re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)

19 - OPINION AND ORDER

(citation omitted).  A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2011)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).  *See also Tr. of S. Cal. Int'l Bhd. of Elec. Workers - Nat. Elec. Contractors Ass'n Pension Plan v. DC Associates, Inc.*, 381 F. App'x 650, 652 (9th Cir. 2010)(same).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011)(citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1987)).  *See also Found. for Horses and Other Animals v. Babbitt,* 154 F.3d 1103, 1106 (9th Cir. 1998)(same).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC*

*Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

<u>**DISCUSSION**</u>

Defendants seek summary judgment as to all of Plaintiffs' claims.

**I.    Plaintiffs' First-Amendment Claim.**

Plaintiffs allege Papas engaged in "protected and constitutional activities of expression . . . that are guaranteed under the First Amendment" when Papas "voic[ed] his opposition to the City's licensing of food carts, and . . . challeng[ed] the OLCC's action to suspend, revoke or invalidate Plaintiffs' liquor license." Plaintiffs allege Defendants retaliated against Plaintiffs by imposing fines, harassing Plaintiffs, and "constant[ly] surveill[ing] . . . the Premises" in "retaliation for Papas's exercise of his First Amendment rights." According to Defendants, however, they had probable cause for their enforcement of the Portland City Code and, in any event,

21 - OPINION AND ORDER

Plaintiffs do not present sufficient evidence to support a claim
of retaliation.

   **A.    The Law.**

        "[T]he law is settled that as a general matter the
First Amendment prohibits government officials from subjecting an
individual to retaliatory actions . . . for speaking out."
*Hartman v. Moore*, 547 U.S. 250, 256 (2006)(citations omitted).
Although "[s]ome official actions adverse to . . . a speaker
might well be unexceptionable if taken on other grounds, . . .
when nonretaliatory grounds are in fact insufficient to provoke
the adverse consequences . . . retaliation is subject to recovery
as the but-for cause of official action offending the
Constitution." *Id.* (citations omitted).

        To succeed on a claim for First-Amendment retaliation,
the plaintiff must show the type of activity he was engaged in
was protected by the First Amendment and that the defendant would
not have taken the retaliatory action "but for" the protected
conduct of the plaintiff. *Id.* at 260. *See also Kinlaw v. Kozak*,
No. C 07-00430 SBA (PR), 2010 WL 986925, at *11 (N.D. Cal.
Mar. 17, 2010).  A claim for First-Amendment retaliation is not
established simply by showing adverse activity by the defendant
after protected speech; the plaintiff must also show a nexus
between the protected speech and the adverse activity.  *See*
*Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000).

To establish a *prima facie* claim of retaliation in violation of the First Amendment, the plaintiff must show

> in addition to evidence that the defendant knew of the protected speech, at least (1) evidence of proximity in time between the protected speech and the allegedly retaliatory decision, (2) evidence that the defendant expressed opposition to the speech or (3) evidence that the defendant's proffered reason for the adverse action was pretextual.

*Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009)(internal citation and emphasis omitted).  If the plaintiff establishes a *prima facie* case of retaliatory harm, the burden shifts to the defendant to show that he would have taken the action complained of even in the absence of the plaintiff's protected speech. *Hartman*, 547 U.S. at 260.  *See also Wilkie v. Robbins*, 551 U.S. 537, 560 & n.10 (2007)(rejects argument that a bad motive alone supports a retaliation claim and concludes "proof that the action was independently justified on grounds other than the improper one defeats the claim.").  If the plaintiff fails to establish retaliation was the "but for" cause of the defendant's action, the claim fails "despite proof of some retaliatory animus in the official's mind." *Kinlaw*, 2010 WL 986925, at *12.  *See also Hartman*, 547 U.S. at 260 ("It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.").

23 - OPINION AND ORDER

**B.   Papas's 2002 Opposition to the City's Licensing of Food Carts.**

As noted, Plaintiffs contend Defendants retaliated against Plaintiffs for Papas's objections in 2002 to the City's licensing of food carts.

Although Defendants concede for purposes of their Motion for Summary Judgment that Papas's 2002 objections to the licensing of food carts is protected speech under the First Amendment, Defendants point out that Papas's objections were not proximate in time to Defendants' enforcement actions:  The undisputed record reflects Papas objected to the licensing of food carts in 2002 and that Defendants did not begin the enforcement actions to which Plaintiffs' object until 2008.

The Court concludes six years between the protected speech and the objected-to enforcement actions is too attenuated to support a reasonable inference of any causal connection between the two.  Moreover, the Court notes Plaintiffs do not point to any evidence that Commissioner Leonard or any other members of the CCIT were aware of or disagreed with Papas's objections to food-cart licensing.

Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes Plaintiffs have not offered sufficient evidence from which a rational juror could find the necessary causal link to support a First-Amendment claim on the basis of Papas's 2002 objection to the City's licensing of food

24 - OPINION AND ORDER

carts.

**C.    Papas's Challenge to the OLCC's Action to Suspend, to Revoke, or to Invalidate Plaintiffs' Liquor License.**

The record reflects on March 21, 2008, the OLCC issued a Notice of Proposed License Cancellation to Plaintiffs in which the OLCC alleged "a history of serious and persistent problems at the licensed premises."  Reeve Decl., Ex. 11 at 1.  In response to the OLCC Notice, Plaintiffs hired an attorney, answered the Notice, denied the charges, and requested an administrative hearing.  The matter was assigned to an ALJ, who conducted a hearing on February 2-3, 9, 13, and 18, 2009.  On April 17, 2009, the ALJ issued a proposed order to which Plaintiffs objected.  On August 28, 2009, the OLCC issued a final order.  On September 23, 2009, Plaintiffs filed a request for reconsideration.  On October 27, 2009, the OLCC entered amended final findings of [fact] and conclusions of law.

As noted, Plaintiffs contend Defendants took enforcement actions against them in retaliation for Papas's challenge to the OLCC's action to suspend, to revoke, or to invalidate Plaintiffs' liquor license.[6]  Defendants concede Plaintiffs' challenge to the OLCC's actions occurred close in time to Defendants' enforcement actions.  Nevertheless,

_____

[6] The OLCC is a state agency.  Papas acknowledges in his deposition that the City does not have any "direct influence" in the decisions of the OLCC.

Defendants contend Plaintiffs have not established "but for" causation.

As evidence of "but for" causation, Plaintiffs rely on the testimony of Papas in his Declaration that in December 2007 he received a telephone call from FI Gerald Alvarez[7] in which he "indicated that the OLCC had plans to shut [Plaintiffs' business] down." Decl. of Ted Papas at ¶ 10. Plaintiffs also point to the deposition testimony of Officer Myers that the OLCC had a confidential informant who "had some information about some . . . serious fire/life safety issues involving the Greek Cusina." Haddad Decl., Ex. 2 at 8.

Even viewing the evidence in the light most favorable to Plaintiffs, however, the record is insufficient for a rational juror to conclude Defendants would not have taken the enforcement actions against Plaintiffs but for Papas's challenge to the OLCC's actions. Papas's testimony serves only as evidence that the OLCC, a state agency unrelated to Defendants, may have been motivated to close Plaintiffs' business. In addition, although the original information about potential life or safety hazards at the Premises came to Defendants through a tip from an OLCC confidential informant, the record reflects Defendants did not act on that tip alone. In fact, Defendants investigated the history of the Premises, including BDS permits, PF&R inspections,

---

[7] In October 2009 FI Alvarez was demoted to Firefighter.

26 - OPINION AND ORDER

and police contacts before they reached their decision regarding
threats to health and safety that might be present at the
Premises.  Defendants also conducted independent inspections of
the Premises and reached their own conclusion that the Premises
contained serious fire-, building-, and life-safety code hazards.
Moreover, Papas testified at deposition that he was not aware of
any facts that suggest the code violations for which Plaintiffs
were cited did not, in fact exist, and he does not contend the
allegations of code violations were invalid.  Reeve Decl., Ex. 1
at 15.  Similarly, Winstead testified at deposition that he
believes the conditions at the Premises that gave rise to the
code violations existed, and he does not believe "the City
trumped up false allegations of the building . . . code or fire
code violations."  Reeve Decl., Ex. 3 at 9.

        The Court notes Plaintiffs emphasize the testimony of
FI Alvarez that, based on his fire inspections, the Premises "had
a fully sprinkled [*sic*] system, with a compliant fire alarm, and
it otherwise met the intent of the [fire] code."  Decl. of George
Alvarez at ¶ 16.  FI Alvarez, however, testified in a
disciplinary investigation that he had never been to the "upper
floors" of the Premises and had never inspected those floors.
Decl. of John Nohr, Ex. 1 at 5.  The record reflects the upper
floors contained a substantial part of the fire- and building-
code violations that were the basis for the CCIT enforcement

27 - OPINION AND ORDER

actions, including illegal apartments and business tenants, illegal shafts and a dumbwaiter, and the absence of fire-resistant materials due to unpermitted construction.  FI Alderman described this combination of conditions as leading to a situation in which the "opening has exposed the second, third, and fourth floors to rapid fire and smoke.  This rapid fire and smoke will diminish the ability to reach the exits on all floors above the first floor.  Fire fighting activities above the second floor will be extremely dangerous."  Alderman Decl., Ex. 3 at 1.

In their recently filed Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs also rely on a March 12, 2012, Powerpoint presentation attached to the Supplemental Declaration of Ted Papas allegedly given by Sergeant Rich Steinbronn of the Portland Police Department which contained a reference to the Greek Cusina as an establishment that was closed due to direct or indirect gang violence. Plaintiffs argue this presentation, which was prepared over two years after the premises was closed, "leaves one to guess at what the real reasons were for Defendants' enforcement actions."  As Defendants point out, it is questionable whether this weeks-old Powerpoint presentation is admissible because it is unauthenticated hearsay.  Even if the Court considered the presentation for what it purports to show, however, the Court concludes it still does not provide a factual basis from which a

28 - OPINION AND ORDER

rational juror could conclude Defendants' actions constituted retaliation for Papas's exercise of his First-Amendment rights before the OLCC or that Papas's exercise of his First-Amendment rights before the OLCC was the "but for" cause of Defendants' enforcement actions.

Moreover, the record also reflects Defendants' enforcement actions were "independently justified on grounds other than the improper one" asserted by Plaintiffs. Specifically, Defendants point to a wealth of evidence that numerous violations of building and fire codes were present at the Premises and created serious safety issues for patrons, employees, renters, and residents of the Premises as well as any firefighters who would respond to fight any potential fire there. For example, BDS records reflect over twenty permits for construction work "were opened" by Plaintiffs for work on the Premises for which final inspections were not obtained as of May 2008.  Botkin Decl. at ¶ 10.  Some of the unpermitted work included adding apartments to the top floor of the building, removing structural walls, and installing a kitchen in the basement.  Id. at ¶ 12.  In addition, the creation of an unpermitted atrium and dumbwaiter left structural beams exposed without any fire resistive material encasing them, which posed "serious and severe safety risks."  Decl. of Hank McDonald at ¶ 11.  In fact, as noted in April 2009, Papas signed a

Stipulation related to a Code Proceeding before a Codes Hearing
Officer in which Papas conceded Plaintiffs violated numerous
sections of the Portland City Code because the Premises contained
a "dangerous structure" and Plaintiffs performed construction
work without a permit.  Reeve Decl., Ex. 9 at 1.[8]

  Viewing the evidence in the light most favorable to
Plaintiffs, the Court concludes there is insufficient evidence
from which a rational juror could find Defendants' actions were
not independently justified on grounds other than retaliation for
Papas's exercise of his First-Amendment rights before the OLCC or
that Papas's exercise of his First-Amendment rights before the
OLCC was the "but for" cause of Defendants' enforcement actions.

  Accordingly, the Court grants Defendants' Motion for
Summary Judgment as to Plaintiffs' First-Amendment claim.[9]

---

[8] In Plaintiffs' Supplemental Memorandum in Opposition to
Defendants' Motion for Summary Judgment, Plaintiffs reiterate the
arguments set out in their Response to Defendants' Motion for
Summary Judgment.  For the reasons noted above, the Court does
not find Plaintiffs' arguments persuasive.

[9] Because the Court concludes Plaintiffs have not made out a
jury question as to causation, the Court declines to address
Defendants' alternative argument that Plaintiffs may also have to
establish lack of probable cause by Defendants.  The Court,
however, notes the Ninth Circuit has declined to extend the rule
requiring probable cause in circumstances similar to those at
issue here.  *See CarePartners, LLC v. Lashway*, 545 F.3d 867, 877
n.7 (9th Cir. 2008)("*Hartman* does not apply to this case because
the Court made a clear distinction between retaliatory-
prosecution actions to which the additional pleading and proof
requirements apply, and "ordinary" retaliation actions to which
the requirements do not apply (*i.e.*, where there is no inde-
pendent prosecutorial action).  This case involves an ordinary

## II.  Plaintiffs' Equal-Protection Claim.

Plaintiffs assert Defendants violated Plaintiffs' right to equal protection when Defendants selectively enforced fire and building codes against Plaintiffs either because Papas "voiced his opposition to the City's licensing of food carts" in 2002 or because Papas challenged the OLCC's decision to suspend, to revoke, or to invalidate Plaintiffs' liquor license, which are "constitutional activities of expression . . . guaranteed under the First Amendment."  In their Response to Defendants' Motion for Summary Judgment, Plaintiffs make clear that they are asserting a "class-of-one" equal-protection claim and that "[p]rotected [c]lass [d]iscrimination is not at issue."

Defendants move for summary judgment as to Plaintiffs' equal-protection claim on the grounds that (1) it is more properly brought as a First-Amendment claim, (2) a class-of-one equal-protection claim may not be brought in the context of a discretionary law-enforcement decision, and (3) Plaintiffs have not established the elements of a class-of-one claim.

### A.  The Law.

The Supreme Court recognized the class-of-one theory of equal-protection in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  In *Olech* the plaintiffs alleged the defendant, the village in which the plaintiffs lived, had demanded a 33'

_____

retaliation action and, therefore, *Hartman* is inapplicable.").

31 - OPINION AND ORDER

easement from the plaintiffs to connect to the municipal water supply, but the defendant had demanded only a 15' easement from all other similarly situated homeowners. *Id*. at 563.  The plaintiffs alleged the defendant's attempt to extract an additional 18' easement "was actually motivated by ill will resulting from [the plaintiffs'] previous filing of an unrelated, successful lawsuit against the village" and the defendant's demand was "irrational and wholly arbitrary." *Id*. at 565.  The district court dismissed the action for failure "to state a cognizable claim under the Equal Protection Clause." *Id*. at 563. The Seventh Circuit reversed and held a plaintiff can allege an equal-protection violation by asserting the state action was motivated solely by a "spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Id*.  The Supreme Court affirmed the Seventh Circuit.  The Court noted the purpose of the Equal Protection Clause is to protect against intentional and arbitrary discrimination, and, therefore, the plaintiffs had stated a cognizable claim under the Equal Protection Clause.  *Id*. at 564-65.

After *Olech* the Ninth Circuit noted in *Lazy Y Ranch Ltd. v. Behrens* that the "class-of-one" theory of equal protection

> is unusual because the plaintiff in a "class of one" case does not allege that the defendants discriminate against a group with whom she shares characteristics, but rather that the defendants

> simply harbor animus against her in particular and therefore treated her arbitrarily. *See N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008)("When an equal protection claim is premised on unique treatment rather than on a classification, the Supreme Court has described it as a 'class of one' claim."[]) (citing *Olech*, 528 U.S. at 564, 120 S. Ct. 1073)). Such circumstances state an Equal Protection claim because, if a state actor classifies irrationally, the size of the group affected is constitutionally irrelevant. *Olech*, 528 U.S. at 564, 120 S. Ct. 1073.

546 F.3d 580, 592 (9th Cir. 2008).  The Ninth Circuit later held:

> To succeed on [a] "class of one" claim, [the plaintiff] must demonstrate that [the defendants]: (1) intentionally (2) treated [the plaintiff] differently than other similarly situated property owners, (3) without a rational basis. *Willow-brook*, 528 U.S. at 564, 120 S. Ct. 1073; *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008).  Although [the plaintiff] must show that [the defendants'] decision was intentional, he need not show that [the defendants'] were motivated by subjective ill will. *Willowbrook*, 528 U.S. at 565, 120 S. Ct. 1073 (rejecting the interpretation that a plaintiff must allege that the governmental action was the result of subjective ill will in a "class of one" claim).

*Gerhart v. Lake County, Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011).  "A class of one plaintiff must show that the discriminatory treatment 'was intentionally directed just at him, as opposed . . . to being an accident or a random act.'"  *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008)(quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)).

Here the parties agree this Court must analyze City Defendants' conduct using a rational-basis standard because

33 - OPINION AND ORDER

neither a suspect classification nor a fundamental right is implicated in this matter.  *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988).  "Selective enforcement of valid laws, without more, does not make the defendants' action irrational."  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1188 (9th Cir. 1995)(citations omitted).  To establish an equal-protection claim, the asserted rational basis for selectively enforcing the law must also be a pretext for an impermissible motive.  *Id*.

   **B.   Plaintiffs' Equal-Protection Claim Is More Properly Brought as a First-Amendment Claim.**

     As noted, Plaintiffs allege Defendants violated Plaintiffs' right to equal protection when Defendants selectively enforced fire and building codes against Plaintiffs either because Papas "voiced his opposition to the City's licensing of food carts" in 2002 or because in 2008 Papas challenged the OLCC's decision to suspend, to revoke, or to invalidate Plaintiffs' liquor license.  According to Plaintiffs, both of Papas's actions were "constitutional activities of expression . . . guaranteed under the First Amendment."

     Although the Ninth Circuit has not addressed the issue, other circuit courts prohibit the assertion of First-Amendment claims as equal-protection claims.  *See Kirby v. City of Elizabeth City, N. Carolina*, 388 F.3d 440, 447 (4th Cir. 2004) ("The claims based on the allegation that [the plaintiff] was

34 - OPINION AND ORDER

treated differently in retaliation for his speech are, at their
core, free-speech retaliation claims that do not implicate the
Equal Protection Clause."). *See also Boyd v. Illinois State
Police*, 384 F.3d 888, 898 (7th Cir. 2004)(The "right to be free
from retaliation may be vindicated under the First Amendment
. . . , but not the equal protection clause."); *Bernheim v. Litt*,
79 F.3d 318, 323 (2d Cir. 1996)(same); *Ratliff v. Dekalb County*,
62 F.3d 338, 340-341 (11th Cir. 1995)("The right to be free from
retaliation is clearly established as a first amendment right
. . . but no clearly established right exists under the equal
protection clause to be free from retaliation."); *Nestor Colon
Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir.
1992)(court found "little basis or justification for applying
equal protection analysis" when the plaintiff's equal-protection
claim overlapped with his failed First-Amendment claim).

     Some district courts in the Ninth Circuit, including
courts in this District, have adopted the reasoning of the First,
Second, Fourth, Seventh, and Eleventh Circuits. *See, e.g.,*
Webber v. First Student, Inc., Civ. No. 11-3032-CL, 2011 WL
3489882 (D. Or. July 12, 2011)(adopted reasoning of the First,
Second, Fourth, Seventh, and Eleventh Circuits); *Mazzeo v.
Gibbons*, No. 2:08-cv-01387-RHL-PAL, 2010 WL 4384207, at *5 (D.
Nev. Oct. 28, 2010)("[Plaintiff's] allegations impermissibly
combine her First Amendment Retaliation and Fourteenth Amendment

35 - OPINION AND ORDER

Equal Protection claims."); *Occhionero v. City of Fresno*, No. CV F 05-1184 LJO SMS, 2008 WL 2690431, at *8 (E.D. Cal. July 3, 2008)("A claim of different treatment in retaliation for speech is a First Amendment claim which does not invoke the Equal Protection Clause.").

This Court finds the reasoning of the First, Second, Fourth, Seventh, and Eleventh Circuits to be persuasive and concludes Plaintiffs' right to be free from retaliation for exercising their rights under the First Amendment must be vindicated under the First Amendment rather than under the Equal-Protection Clause.

## C. Discretionary Decisionmaking.

Even if Plaintiffs were not required to bring their equal-protection claim as a First-Amendment claim, Defendants contend it is questionable whether Plaintiffs could bring a class-of-one equal-protection claim to challenge a discretionary law-enforcement decision like the one at issue here.  To support their position, Defendants rely on the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture* and the decisions of a number of circuit courts applying *Engquist*.

In *Engquist* the Supreme Court addressed whether the plaintiff, a public employee, could maintain a class-of-one equal-protection claim based on allegations that she was terminated for arbitrary, vindictive, and malicious reasons.  The

36 - OPINION AND ORDER

Court concluded a class-of-one equal-protection claim was not
viable in the public-employment context because, among other
things,

> [w]hat seems to have been significant in *Olech*
> . . . was the existence of a clear standard
> against which departures, even for a single
> plaintiff, could be readily assessed.  There was
> no indication in *Olech* that the zoning board was
> exercising discretionary authority based on
> subjective, individualized determinations — at
> least not with regard to easement length, however
> typical such determinations may be as a general
> zoning matter.  Rather, the complaint alleged that
> the board consistently required only a 15-foot
> easement, but subjected Olech to a 33-foot
> easement.  This differential treatment raised a
> concern of arbitrary classification, and we
> therefore required that the State provide a
> rational basis for it.

553 U.S. 591, 602-03 (2008)(citations omitted).  The Supreme
Court went on to note, however, that there could be situations in
which a class-of-one equal-protection claim would not be viable
because

> [t]here are some forms of state action . . .,
> which by their nature involve discretionary
> decisionmaking based on a vast array of
> subjective, individualized assessments.  In such
> cases the rule that people should be "treated
> alike, under like circumstances and conditions" is
> not violated when one person is treated
> differently from others, because treating like
> individuals differently is an accepted consequence
> of the discretion granted.  In such situations,
> allowing a challenge based on the arbitrary
> singling out of a particular person would
> undermine the very discretion that such state
> officials are entrusted to exercise.
>
> Suppose, for example, that a traffic officer is
> stationed on a busy highway where people often

drive above the speed limit, and there is no basis
upon which to distinguish them.  If the officer
gives only one of those people a ticket, it may be
good English to say that the officer has created a
class of people that did not get speeding tickets,
and a "class of one" that did.  But assuming that
it is in the nature of the particular government
activity that not all speeders can be stopped and
ticketed, complaining that one has been singled
out for no reason does not invoke the fear of
improper government classification.  Such a
complaint, rather, challenges the legitimacy of
the underlying action itself — the decision to
ticket speeders under such circumstances.  Of
course, an allegation that speeding tickets are
given out on the basis of race or sex would state
an equal protection claim, because such
discriminatory classifications implicate basic
equal protection concerns.  But allowing an equal
protection claim on the ground that a ticket was
given to one person and not others, even if for no
discernible or articulable reason, would be
incompatible with the discretion inherent in the
challenged action.  It is no proper challenge to
what in its nature is a subjective, individualized
decision that it was subjective and indivi-
dualized.

*Id.* at 603-04.  The Court noted "[t]his principle applies most

clearly in the employment context, for employment decisions are

quite often subjective and individualized, resting on a wide

array of factors that are difficult to articulate and quantify."

The Court, therefore, concluded an equal-protection class-of-one

claim was a "poor fit" in the employment context and concluded

such a claim was not cognizable under the circumstances of

*Engquist*.

     Following *Engquist*, circuit courts have split as to the

viability of class-of-one equal-protection claims in other

contexts that "by their nature[,] involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."  The Ninth Circuit recently addressed the issue in the context of an appeal challenging Arizona's execution protocol.  *See Towery v. Brewer*, No. 12-15381, 2012 WL 627787 (9th Cir. Feb. 28, 2012).  In *Towery* two inmates with impending execution dates moved for a preliminary injunction against the Arizona Department of Corrections' (ADC) use of its current lethal-injection protocol on the ground that, among other things, the plaintiffs are each "a 'class of one,' and that the protocol allows the [ADC] Director to treat [them] differently from others similarly situated with no rational basis for doing so."  *Id.*, at *9.  The district court denied the preliminary injunction.  The Ninth Circuit affirmed as follows:

> The class-of-one doctrine does not apply to forms of state action that "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 603 (2008). . . .  Here, decisions on matters such as which drug protocol to use, which people to select for the execution team, and whether to use a central femoral IV are, under Arizona's statutory scheme, relegated to the Director, with no State law requirement that there be uniformity. Ariz. Rev. Stat. § 13-757(A).

*Id.*

Similarly, the plaintiff in *Novotny v. Tripp County, S.D.*, brought an equal-protection class-of-one claim on the ground that "county weed ordinances were unequally enforced

39 - OPINION AND ORDER

against him." 664 F.3d 1173, 1178 (8th Cir. 2011). The Eighth
Circuit concluded the plaintiff's class-of-one claim failed as a
matter of law because "class-of-one claim[s] do[] not extend to
cases where the rules are uniformly applicable and a state
official exercises his 'discretionary authority based on
subjective, individualized determinations.'" *Id*. at 1179
(quoting *Engquist*, 553 U.S. at 602-03). *See also Flowers v. City
of Minneapolis, Minn*., 558 F.3d 794, 799-800 (8th Cir. 2009)("In
light of *Engquist*[,] . . . we conclude that while a police
officer's investigative decisions remain subject to traditional
class-based equal protection analysis, they may not be attacked
in a class-of-one equal protection claim."). Likewise, in *United
States v. Moore* the defendant appealed his conviction on the
ground that the government committed a class-of-one equal-
protection violation because "the government arbitrarily and
irrationally singled him out for differential treatment from the
defendants" in a different drug-conspiracy case. 543 F.3d 891,
895 (7th Cir. 2008). The Seventh Circuit affirmed the
defendant's sentence on the ground that the logic of *Engquist* was

> equally applicable to the exercise of prosecutory
> discretion. To treat like individuals differently
> in this context, even without a strictly rational
> justification, "is not to classify them in a way
> that raises equal protection concerns," *Engquist*,
> 128 S. Ct. at 2155; the discretion conferred on
> prosecutors in choosing whom and how to prosecute
> is flatly inconsistent with a presumption of
> uniform treatment. Indeed, in this context, there
> is no readily apparent standard against which

> departures can be assessed for arbitrariness.
> Therefore, a class-of-one equal protection
> challenge, at least where premised solely on
> arbitrariness/irrationality, is just as much a
> "poor fit" in the prosecutorial discretion context
> as in the public employment context.  Accordingly,
> [the defendant's] class-of-one challenge fails.

*Id*. at 901.  *See also Abcarian v. McDonald,* 617 F.3d 931, 939

(7th Cir. 2010)("We have interpreted *Engquist* to stand for the

broad proposition that inherently subjective discretionary

governmental decisions may be immune from class-of-one claims.").

Here the record reflects the "key considerations" of

Commissioner Leonard when he evaluated properties for coordinated

code-enforcement activity by CCIT included the number and

severity of building-code violations and/or fire-code violations,

the high levels of police services, and the history of

cooperation or lack thereof by the property owners in addressing

violations.  Commissioner Leonard reviewed these factors, among

others, in order to make a subjective, discretionary

determination whether a building presented "a significant threat

to the public health and safety best addressed by the coordinated

approach [of CCIT]."  Leonard Decl. at ¶¶ 11-12.  Although

Commissioner Leonard used the standards set out in the fire and

building codes to determine whether properties were in violation

of those codes, the ultimate determination as to whether the

violations at issue combined with other factors created a

situation "best addressed by" CCIT remained entirely within

Commissioner Leonard's discretion.

On this record the Court finds an equal-protection class-of-one claim is a "poor fit" because, as in *Engquist*, the decision to designate a property as a CCIT project and the manner in which code enforcement was carried out by Defendants involved "by their nature . . . discretionary decisionmaking based on a vast array of subjective, individualized assessments." Accordingly, the Court concludes pursuant to *Engquist, Towery, Novotny*, and other cases that Plaintiffs do not have a cognizable class-of-one equal-protection claim against Defendants under these circumstances.

**C.    Merits.**

Even if the Court concluded Plaintiffs could bring a class-of-one claim in the present context, Defendants contend Plaintiffs have not established the elements of such a claim.   In particular, Defendants contend Plaintiffs have not shown they were treated differently than similarly situated businesses or that there was not any rational basis for Defendants' actions.

As noted, "to succeed on [a] "class of one" claim, [the plaintiff] must demonstrate that [the defendants]: (1) intentionally (2) treated [the plaintiff] differently than other similarly situated property owners, (3) without a rational basis." *Gerhart*, 637 F.3d at 1022.

42 - OPINION AND ORDER

1.    **Similarly-Situated Properties.**

In the context of a class-of-one equal-protection claim, "[w]ith respect to the differential treatment element, a plaintiff must demonstrate that the level of similarity between plaintiff and the persons with whom they compare themselves must be extremely high." *Solis v. City of Fresno*, No. 1:11-CV-00053 AWI GSA, 2011 WL 5825661, at *7 (E.D. Cal. Nov. 17, 2011)(citing *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)). *See also* Huff v. City of Portland, No. Civ. 05-1831-AA, 2006 WL 572152, at *4 (D. Or. Mar. 6, 2006)(same). "To succeed, plaintiffs must demonstrate that they were treated differently than someone who is *prima facie* identical in all relevant respects." *Id*. (citing *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). A plaintiff must establish "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Id*. (citing *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007)).

Here Defendants assert Plaintiffs' equal-protection claim fails because Plaintiffs cannot establish they were intentionally treated differently than similarly-situated persons. Specifically, Defendants note Plaintiffs do not identify any property with the same type and degree of fire- and

building-code violations as those present at the Premises.   The
Court agrees.

Although Plaintiffs point to a number of
properties that they contend are similarly situated, the record
does not contain evidence that those properties had any building-
code violations or similar levels of police and fire calls.   Some
of the alleged comparator properties are also plainly dissimilar
in circumstance to Plaintiffs' property.   For example, FI Alvarez
testifies in his Declaration that the Edith Green/Wendell Wyatt
Building "contained numerous and dangerous fire exiting problems,
failed to have any quarterly reports, [had] an open atrium with
an old sprinkler system and significant electrical problems."
Alvarez Decl. at ¶ 6.   The record, however, reflects the Edith
Green/Wendell Wyatt Building is a federal building over which the
City of Portland has no authority to enforce its fire or building
codes.   Decl. of Camron Doss at ¶¶ 3-5.   Accordingly, Defendants
could not have undertaken any enforcement activities at that
property even if they desired to do so.

Similarly, with respect to the Roseland Theater,
another property identified by Plaintiffs, Officer Myers
testified at deposition that when he visited it on New Year's
Eve, he found it to be "tremendously over capacity [with] extreme
fire/life safety violations in terms of if a gun had gone off in
there or a fight or a fire [there could have been] a horrendous

44 - OPINION AND ORDER

situation." Haddad Decl., Ex. 28 at 18.  The record, however, reflects Officer Myers did not have any expertise with respect to fire- or building-code violations.  In addition, BDSI Botkin testifies the Roseland Theater (1) was granted an appeal by BDS and allowed an occupancy increase to 1410 people, (2) had received and finalized all building permits, and (3) was in compliance with all building, electrical, mechanical, and plumbing-code standards.  Second Decl. of Joseph Botkin at ¶ 12. Accordingly, Plaintiffs have not established a record from which a rational juror could find the Roseland Theater was "identical in all relevant respects" to the Premises.

Plaintiffs also assert 915 S.W. Second Avenue is the property most similarly-situated to the Premises that was never officially designated as a CCIT project nor subjected to similar levels of enforcement by CCIT.  Although 915 S.W. Second Avenue is more similar to the Premises than the other properties that Plaintiffs list, the record reflects it was not *prima facie* identical in all relevant respects.  For example, 915 S.W. Second Avenue did not have a history of failing to comply with permit requirements when performing construction work and alterations. In addition, 915 S.W. Second Avenue did not have any occupancy above the first-floor mezzanine (often referred to as the second floor) whereas the Premises had business offices and unpermitted residences on upper floors as well as assemblies of large numbers

45 - OPINION AND ORDER

of people on the third floor when the Premises were used as a
night club.  FI Alderman testifies "assembly occupancies above a
second floor present far greater exiting hazards in the event of
a fire" as well as greater risks to firefighters at those levels.
Second Decl. of Michael Alderman at ¶ 5.  Moreover, even though
915 S.W. Second Avenue was never officially designated as a CCIT
project, the record reflects the CCIT treated 915 S.W. Second
Avenue similarly to the Premises in terms of coordinated
enforcement.

On June 29, 2009, CCIT personnel inspected 915
S.W. Second Avenue and extensive enforcement and abatement
activity by BDS and PF&R followed.  PF&R imposed a fire watch for
14 months, which was required to be in place any time the second
floor of the building was occupied.  The fire watch was checked
regularly by CCIT personnel and, unlike in Plaintiffs' building,
found to be in compliance on all checks.  The fire watch was
lifted when the owner reconstructed the northwest stairwell to
the second floor in compliance with BDS and PF&R requirements.
In addition, when directed by members of BDS and PF&R to do so,
the owner of 915 S.W. Second Avenue "promptly vacated the illegal
occupancy of the basement (office) and legally relocated to the
first floor . . . and subsequently remained compliant concerning
activity in the basement." *Id.*

In contrast, after PF&R and BDS ordered Plaintiffs

46 - OPINION AND ORDER

to discontinue illegal and unsafe occupancy of the basement and
to vacate all floors above the second floor, PF&R and Officer
Myers found on a number of occasions that Plaintiffs were not in
compliance with those orders. *Id*. Plaintiffs, therefore, have
not established the 915 S.W. Second Avenue was "identical in all
relevant respects" to Plaintiffs' property or that Defendants
treated 915 S.W. Second Avenue differently than the Premises.[10]

Accordingly, Plaintiffs have not provided
sufficient evidence from which a rational juror could find
Defendants treated Plaintiffs differently than other similarly-
situated property owners.

### 2. **Rational Basis**.

Even if Plaintiffs established Defendants treated
them differently than similarly-situated individuals, Defendants
also assert they had a rational basis for their actions; *i.e.*,
the Premises was assigned to CCIT enforcement because it had
substantial and dangerous fire-code violations; the Premises had
significant building-code violations; and the Premises required
high levels of police services in the past.

The Ninth Circuit has held cities have "an obvious

---

[10] Plaintiffs list numerous other properties as similarly
situated to the Premises. Although the Court declines to discuss
all of those properties in this Opinion and Order, the Court
notes it has reviewed the record and concludes Plaintiffs have
not established any of those properties are "identical in all
relevant respects" to the Premises.

interest in preventing safety and sanitation hazards by enforcing the housing code." *Armendariz v. Penman*, 75 F.3d 1311, 1328 (9th Cir. 1996), *overruled on other grounds by Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 856-57 (9th Cir.2007).  The Ninth Circuit, however, has made clear that when evaluating the rational-basis requirement, courts must "analyze[] whether there was a rational basis for treating [the plaintiff] differently." *Gerhart*, 2011 WL 923381, at *8 (emphasis omitted).  "We have recognized that the rational basis prong of a 'class of one' claim turns on whether there is a rational basis for the *distinction*, rather than the underlying government *action*."  *Id*. (emphasis in original).  Thus, the issue is whether Defendants had a rational basis for CCIT enforcement.

As noted, Defendants assert they had a rational basis for CCIT enforcement because the Premises had substantial and dangerous fire-code violations; the Premises had significant building-code violations; and the Premises required high levels of police services in the past.  Plaintiffs, however, contend Defendants' reasons for CCIT enforcement are mere pretext. Plaintiffs maintain the Premises was, in fact, subject to CCIT enforcement either because Papas "voiced his opposition to the City's licensing of food carts" in 2002 or because Papas challenged the OLCC's decision to suspend, to revoke, or to invalidate Plaintiffs' liquor license in 2008.

48 - OPINION AND ORDER

Although Plaintiffs assert the property was
subject to CCIT enforcement because Papas objected to the
licensing of food carts in 2002, Plaintiffs concede Papas's
actions did not occur close in time to the 2008 CCIT enforcement
efforts nor do they point to any admissible evidence that
Commissioner Leonard[11] or any other member of the CCIT were
involved in or even aware of Papas's opposition to the licensing
of food carts before Plaintiffs filed this action.  Commissioner
Leonard, FI Alderman, BDSI Botkin, BDSI McDonald, and Officer
Myers testify in their Declarations that they were unaware of
Papas's 2002 objections to licensing of food carts before
Plaintiffs filed this action.  Even viewing the evidence in the
light most favorable to Plaintiffs, the Court concludes
Plaintiffs have not proffered sufficient evidence from which a
rational juror could find Defendants' enforcement actions against
Plaintiffs were merely a pretext for retaliation against Papas
for his 2002 objections to food-cart licensing by the City.

Plaintiffs also assert Defendants' enforcement
actions through CCIT were a mere pretext for retaliation against
Papas for his challenge of the OLCC's decision to suspend, to

---

[11] The Court notes the only evidence Plaintiffs point to in
support of their contention that Defendants took enforcement
action against Plaintiffs because of Papas's 2002 objections to
licensing of food carts is inadmissible hearsay.  Specifically,
Plaintiffs rely on Papas's deposition testimony that a reporter
told Papas that "sources" had told the reporter about statements
by Commissioner Leonard that the sources allegedly overheard.

49 – OPINION AND ORDER

revoke, or to invalidate Plaintiffs' liquor license in 2008.  For
the reasons noted in the Court's discussion of Plaintiffs' First-
Amendment claim, the Court also concludes Plaintiffs have not
made out a jury question that Defendants' enforcement actions
were mere pretext for retaliation against Papas for his challenge
to the OLCC's actions.

     In summary, the Court grants Defendants' Motion for Summary
Judgment as to Plaintiffs' class-of-one equal-protection claim on
each of the following separate grounds:  (1) Plaintiffs' rights
under the circumstances here must be vindicated under the First
Amendment rather than under the Equal-Protection Clause,
(2) Plaintiffs do not have a cognizable class-of-one claim
against Defendants under these circumstances, and (3) Plaintiffs
have not established Defendants intentionally treated Plaintiffs
differently than other similarly situated property owners without
a rational basis.

**III. Plaintiffs' Claim for Tortious Interference with Economic
     Relations.**

     Plaintiffs contend in their Complaint that Defendants
tortiously interfered with Plaintiffs' business relationships
with "their lender, financiers, and customers" by "engaging in
continued surveillance and inspections of the Premises, and also
by creating a lien on the property which would lead to the
foreclosure of the building by Plaintiffs' lender," and
"creat[ing] a nuisance on or near the Premises, turning away

50 - OPINION AND ORDER

customers who would otherwise have done business with Plaintiffs."  In Plaintiffs' Response to Defendants' Motion, however, Plaintiffs assert only that they had "contractual relationships with tenants in their building, [they] were required to sever such relationships upon Defendants' order to vacate the premises, [and that] resulted in the loss of revenue and rent."

Defendants move for summary judgment as to this claim on the ground that Plaintiffs do not point to any evidence that Defendants acted with an improper purpose or through improper means.

Under Oregon law the elements of a claim for intentional tortious (or intentional) interference with a business relationship are:

> (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage); (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages.

*Allen v. Hall*, 328 Or. 276, 281 (1999).  *See also Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 477 (2009)(same).

"'The fifth element [of the tort of intentional interference] requires a causal nexus between the *interference* and the *damage* to the relationship.'"  *MLM Prop.*, 2010 WL 678149,

51 - OPINION AND ORDER

at *7 (quoting *Douglas Med. Ctr.,* 203 Or. App. at 635)(emphasis
in original).

To support their claim for tortious interference, Plaintiffs
point to the Declaration of Ted Papas in which he testifies:

> After the May 14th raid on [the Premises], and the
> closure of the basement and upper floors, the
> Greek Cusina's revenue significantly declined.
> Without tenants on the upper floors, the loss of
> all revenue from the banquet space and dance hall,
> and the negative publicity in the local media that
> the building was a fire hazard, the Greek Cusina
> was losing approximately $10,000 weekly.
>
> * * *
>
> Throughout 2009, . . . I . . . negotiated with
> lenders . . . to provide loans for the
> improvements that Mr. Winstead had provided, and
> asked the City to subordinate the lien against the
> property so that the bank would provide me with
> funds to make the necessary repairs.  Mr. Leonard
> and the City refused to subordinate the lien.

Papas Decl. at ¶¶ 22, 38.

The record reflects Plaintiffs closed the basement to
everything but refrigerated food storage and closed the upper
floors of the Premises for all purposes because both areas had
been modified without permits and in ways that created
significant fire and structural hazards.  For the reasons noted
with respect to Plaintiffs' First-Amendment and equal-protection
claims, however, the Court also concludes Plaintiffs have not
established that Defendants limited the use of the basement and
closed the upper floors of the Premises through improper means or
with an improper purpose.  Accordingly, to the extent those

52 - OPINION AND ORDER

allegations form the basis for Plaintiffs' tortious interference claim, the Court grants Defendants' Motion for Summary Judgment.

With respect to Defendants' refusal to forgo or to subrogate the City's lien against the Premises for the cost of the third-party fire watch at the Premises, Plaintiffs fail to point to any evidence that establishes Defendants acted with improper means or with an improper motive. As noted, Commissioner Leonard declined to forgo or to subrogate the City's liens because he "did not believe there was any justification for the public to forgo its legal right to recoup its expenditure of public funds." Leonard Decl. at ¶ 27. Plaintiffs concede taxpayer funds were used to pay for the third-party fire watch and that the City did not have any legal obligation to forgo its liens. Reeve Decl., Ex. 1 at 36; Ex. 2 at 15. Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes Plaintiffs have not established Defendants' refusal to forgo or to subrogate the third-party fire-watch liens was done with an improper purpose or through improper means.

In addition, Harlan Barcus, Executive Vice President and Chief Credit Officer of Capital Pacific Bank, testifies in his Declaration that Capital Pacific made the decision to initiate foreclosure and receivership proceedings against Plaintiffs and to refrain from making additional loans to Plaintiffs for the purpose of making repairs to the Premises due to

53 - OPINION AND ORDER

> several defaults by [Plaintiffs] under their loan
> agreements and instruments with Capital Pacific
> Bank, including the failure to make timely monthly
> payments on the note, allowing a judgment lien to
> be filed against the real property by an unpaid
> vendor, the return of checks for insufficient
> funds and the failure of [Plaintiffs] to cure the
> default caused by the lien for unpaid fire watch
> charges filed against the [premises].
>
> Prior to initiating foreclosure proceedings
> against plaintiffs, Capital Pacific Bank had never
> accepted any bids for contractors to make repairs
> at the building nor had it ever agree to lend any
> money to fund such repairs.

Decl. of Harlan Barcus at ¶¶ 4-5. Accordingly, even if there was

evidence from which a rational juror could find Defendants acted

with improper means or improper purpose, Plaintiffs have not

shown a causal link between Defendants' refusal to forego or to

subrogate the third-party fire-watch lien and Plaintiffs' alleged

damages. In particular, the record does not contain any evidence

that Capital Pacific Bank agreed to lend Plaintiffs any money for

repairs, and, in any event, the third-party fire-watch lien was

one of only several defaults by Plaintiffs that led to

foreclosure of the Premises. Thus, the evidence is insufficient

for a rational juror to find Plaintiffs would have obtained

financing from Capital Pacific Bank or any other lending

institution absent the City's lien.

Accordingly, the Court grants Defendants' Motion for Summary

Judgment on Plaintiffs' claim for tortious interference with

economic relations.

54 - OPINION AND ORDER

**CONCLUSION**

For these reasons, the Court **GRANTS** Defendants' Motion (#38)

for Summary Judgment and **DISMISSES** this matter **with prejudice**.

Defendants' counsel shall submit an appropriate form of

Judgment **no later than May 14, 2012.**

IT IS SO ORDERED.

DATED this 25th day of April, 2012.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


55 – OPINION AND ORDER